# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

Jennette Shannon,

                    Plaintiff,          Case No. 23-12473

v.                                      Judith E. Levy
                                        United States District Judge
Flex N Gate Detroit, LLC,
                                        Mag. Judge Anthony P. Patti
                    Defendant.

_____/

## ORDER GRANTING DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT [17]

Before the Court is Defendant Flex N Gate Detroit, LLC's motion for summary judgment. (ECF No. 17.) On September 29, 2023, Defendant removed this case from Wayne County Circuit Court. (ECF No. 1.) Plaintiff Jennette Shannon brings suit against her former employer, alleging that Defendant violated the Michigan COVID-19 Employment Rights Act ("CERA"), Mich. Comp. Laws § 419.401 *et seq.*.[1]

---

[1] Plaintiff waives her claims for race discrimination and retaliation pursuant to Michigan's Elliott-Larsen Civil Rights Act. (ECF No. 20, PageID.983–984, 992.)

This motion is fully briefed. (ECF Nos. 20, 23.) On February 20, 2025, the Court held a hearing and heard oral argument on Defendant's motion. (ECF No. 24.)

For the reasons set forth below, Defendant's motion is granted.

## I.   Background

Defendant operates an automotive manufacturing plant in Detroit. (ECF No. 17, PageID.415; ECF No. 17-2, PageID.444.) Plaintiff was an employee there and was temporarily laid off at the start of the COVID-19 pandemic in March 2020, along with the other hourly production employees. (*Id.* at PageID.445; ECF No. 20-2, PageID.1042.) She was called back to work around May 18, 2025. (*Id.* at PageID.1040; ECF No. 17-32, PageID.964; ECF No. 20-6, PageID.1107.) However, on her first day back, Plaintiff had a runny nose or possibly sinus issues. (ECF No. 20-2, PageID.1040–1041.) She was told by a nurse to go home and quarantine for 14 days, but then was informed by email that she must get tested for COVID-19 if she experiences COVID-19 symptoms and must return to work if she tests negative. (ECF No. 20-6, PageID.1106–1107.) She tested negative. (ECF No. 20-2, PageID.1041.) Plaintiff wanted to continue quarantining, but was instructed that she must

2

return or "[her] absences would begin to fall under the attendance policy."
(ECF No. 20-6, PageID.1105.) Plaintiff returned to work. She was not
disciplined related to her May 2020 attendance, nor was she given any
attendance points, which count against an employee's attendance record.
(ECF No. 17-2, PageID.445–446; ECF No. 17-5, PageID.670.)

On July 9, 2020, Plaintiff filed a National Labor Relations Board
("NLRB") charge against Defendant. (ECF No. 17-20, PageID.895.) The
charge said,

> Discipline[d] when complained about points given when sent home
> by [Defendant] for quarantine for a runny nose. Told HR the
> Governor's Executive order did [not] allow that . . . Allowed to come
> back to work but harassed and retaliated against because I gave
> this information to other employees that they were trying to fire for
> points accumulated being out on COVID-19 quarantine. I have been
> put on machines I wasn't train[e]d for, given harder jobs, force
> overti[m]e without notice not even five minutes . . . .

(ECF No. 20-12.) This complaint was dismissed by the NLRB on
September 22, 2020. (ECF No. 17-21.)

Defendant sent a text to employees on October 14, 2020, asserting
that employees must come back to work if they test negative for COVID-
19. (ECF No. 20-7.)

3

On October 21, 2020, Plaintiff received a call from the Michigan Department of Health and Human Services ("MDHHS"). (ECF No. 20-2, PageID.1045–1046.) The MDHHS representative informed her that she was exposed to COVID-19 at work two weeks earlier on October 7, 2020, and that she should get tested. (*Id.*; ECF No. 17-26.)  The representative then emailed Plaintiff a letter regarding her COVID-19 exposure. Plaintiff had been experiencing diarrhea prior to this contact, which could be a symptom of COVID-19. (ECF No. 20-2, PageID.1046.) The next day, Plaintiff went to work and showed a supervisor (Astrid or Astik) the letter from MDHHS. Plaintiff asked why Defendant had not informed employees that "COVID is in the plant." (*Id.* at PageID.1045; ECF No. 20-3, PageID.1078.) Astrid or Astik told her "he thought the company was doing a fine job." (ECF No. 20-2, PageID.1045.) Plaintiff was permitted to get tested for COVID-19 by Jeff Tanaka from HR. (*Id.*) She used vacation time to get tested for COVID-19, and tested negative. (*Id.* at PageID.1045–1046.) She returned to work on October 23, 2020 and she wanted to quarantine, but was afraid of being fired. (*Id.* at PageID.1046; ECF No. 17-5, PageID.668.)

On November 2, 2020, Plaintiff was given a verbal warning for "grandstanding." (ECF No. 17-25.) The warning stated, "[o]n 10/27/2020 you were witnessed grand standing in the plant. You have been advised prior that grand standing in the plant is not authorized." (*Id.*) According to Plaintiff, the verbal warning was related to her COVID-19 complaints. (ECF No. 20-2, PageID.1036.) She argues that she received the verbal warning due to her complaints "[b]ecause I had asked was it COVID in the plant because the supervisors was talking about it" and "[l]ater on that day Janella comes with that write-up there of grandstanding COVID." (*Id.*) Plaintiff also appears to argue that it relates to her informing her peers that there were other employees who tested positive for COVID-19, and that management was not informing them contrary to "COVID rules and regulations." (*Id.*)

Defendant maintains the verbal warning was issued for reasons that had nothing to do with COVID-19. Instead, "it was a result of Ms. Shannon interrupting production . . . . [I]t was related to her claims that there was a collective bargaining agreement already signed at the time with the union that the company was refusing to provide to employees which was untrue." (ECF No. 17-32, PageID.966; *see also* ECF No. 17-6,

5

PageID.671 (HR Memorandum from Jeff Tabaka); ECF No. 17-32, PageID.966).)

On November 4, 2020, Plaintiff's previous attorney sent Timothy Graham, General Counsel for Defendant, a letter describing perceived COVID-19 violations and retaliation. (ECF No. 6-1, PageID.284–287.)[2] She did not receive a response. (ECF No. 20-3, PageID.1081.)

On November 20, 2020, Plaintiff filed a whistleblower complaint with the Occupational Safety and Health Administration ("OSHA"), which was referred to the Michigan Occupational Safety and Health Administration ("MIOSHA"). (ECF No. 6-1, PageID.292; ECF No. 20-22, PageID.1178.) In response to her complaint, MIOSHA conducted an inspection of the plant on December 7, 2020. (*Id.*; ECF No. 17-14, PageID.869.) Defendant did not know the identity of the complainant. (ECF No. 17-14, PageID.870.) MIOSHA issued a citation against Defendant on June 15, 2021, for alleged violations of the "COVID Emergency Rules." (*Id.*) MIOSHA and Defendant entered a settlement

---

[2] Plaintiff's index of exhibits indicates that Plaintiff's Exhibit 20 is "Graham letter, RTP pages 15-28, Ex. 12 to First Amended Complaint." (ECF No. 2-1, PageID.1023.) Plaintiff appears to have submitted the wrong exhibit as Exhibit 20. (*See* ECF No. 20-21.)

6

agreement regarding these citations on January 6, 2022. (ECF No. 17-15.)

On January 5, 2021, Plaintiff filed an additional whistleblower complaint with MIOSHA, which communicated,

> Complainant states after she raised many safety and health concerns concerning her employer's precautions and policies relating to COVID to individuals in management she received a write up for "grandstanding". She admits she did inform other employees about co-workers who had tested positive for COVID because her employer would not. Since this, the complainant had suffered continued harassment.

(ECF No. 17-18, PageID.893.) In the section of the MIOSHA complaint form that asks "[t]o whom, when and what were the results of your complaint," she responded "Ken Williams." (*Id.*) This whistleblower complaint was dismissed on July 15, 2021, because "the evidence does not support a violation of Section 65(1) of MIOSHA." (ECF No. 17-19.)

In October 2021, Plaintiff applied for and was granted short-term disability leave from October 8, 2021 through November 9, 2021 due to knee issues. (ECF No. 17-28, PageID.954; ECF No. 17-13, PageID.812; ECF No. 17-2, PageID.449; ECF No. 20-2, PageID.1048.) During her leave, Plaintiff tested positive for COVID-19 on November 5, 2021. (*Id.*;

7

ECF No. 17-27; ECF No. 20-29, PageID.1236.) She returned to work on or about November 20, 2021. (ECF No. 20-2, PageID.1034.)

On November 22, 2021, Plaintiff went to work, but, while she waited for clearance to leave work, an unidentified male employee came up to Plaintiff and called her a bitch. (ECF No. 17-29, PageID.958 ("[A]nd he said Bitch don't be fucking moving your neck at me."); ECF No. 20-2, PageID.1058 ("And when he came over to me he said, Bitch, what did you say?").) She submitted an incident report to HR, but did not identify the employee who harassed her. (ECF No. 17-29.) When Plaintiff asked a week later why HR had not contacted her regarding the incident, Defendant responded that, because she was on Family and Medical Leave Act ("FMLA") leave, it "intends to follow up with you upon your return to work" and noted that she did not name the employee or provide enough detail for Defendant to identify him. (ECF No. 20-32, PageID.1251.) Instead of providing the name, Plaintiff claimed that Defendant had the resources and ability to identify the employee without her help. (*Id.* at PageID.1250.)

Plaintiff never returned to her workplace after that incident. She went on leave until she was terminated on January 18, 2022. (ECF No.

17-5, PageID.666; ECF No. 17-17; ECF No. 20-2, PageID.1032.) The stated reason for termination was because her FMLA leave "was exhausted in early December" and she had not "provided any documentation supporting your continued absence from work, followed up . . . to address any questions regarding your leave, or otherwise communicated any reason for your continued failure to provide the requested documentation." (ECF No. 17-17.) Plaintiff expressed that she did not return to work "because she feared for her safety and her life." (ECF No. 20, PageID.1010; *see also* ECF Nos. 20-32, 20-33.)

Finally, Plaintiff alleges various facts that are not linked to any time or date. First, she states that the women's restroom was very dirty, and that she complained about these conditions, but her complaints were not acted on. (ECF No. 20-2, PageID.1071.) She does not identify who she complained to or when she complained. In her post-deposition affidavit, she contends that on an unidentified date she "expressed to HR and my supervisor that the lack of cleanliness could contribute to a higher risk of contracting COVID-19." (ECF No. 20-3, PageID.1080.) Plaintiff says that those concerns were ignored "but the retaliation increased." (*Id.*) She does not describe any examples of retaliation related to those statements.

Second, Plaintiff states that, on an unknown date, "she was moved from her regular machine and placed on a machine she was not familiar with in another department," was scrutinized by "Janella," and was told by "safety officer Cary Jo" that "her discipline and current treatment was coming from HR manager Jeff and Superintendent Sam." (ECF No. 20, PageID.1004 (citing ECF No. 20-3, PageID.1079–1080).)

Finally, Plaintiff testified that "the whole door line was sent home to quarantine after a severe COVID-19 outbreak," that the door line supplied her parts, and her request to quarantine was refused. (ECF No. 20-3, PageID.1080.) Plaintiff does not identify when that occurred, or who refused her request to quarantine.

## II.    Legal Standard

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "If the moving party satisfies its burden, then the burden of going forward shifts to the nonmoving party to produce evidence that results in a conflict of material fact to be resolved by a jury." *Cox v. Ky. Dept. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995). The Court may not grant summary judgment if "the

evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court "views the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the nonmoving party." *Pure Tech Sys., Inc. v. Mt. Hawley Ins. Co.*, 95 F. App'x 132, 135 (6th Cir. 2004) (citing *Skousen v. Brighton High Sch.,* 305 F.3d 520, 526 (6th Cir. 2002)).

## III.   Analysis

### A. Plaintiff's post-deposition affidavit

Defendant argues that the Court must disregard portions of Plaintiff's post-deposition affidavit, dated August 14, 2024, because it directly contradicts her deposition testimony. (ECF No. 23, PageID.1321; *see* ECF No. 20-3 (affidavit).)

When deciding the admissibility of a post-deposition affidavit at the summary judgment stage, the Court "must first determine whether the affidavit directly contradicts the nonmoving party's prior sworn testimony." *Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 908 (6th Cir. 2006). "A directly contradictory affidavit should be stricken unless the party opposing summary judgment provides a persuasive

justification for the contradiction." *Id.* If there is no direct contradiction, courts "should not strike or disregard that affidavit unless the court determines that the affidavit 'constitutes an attempt to create a sham fact issue.'" *Id.* (quoting *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986)).

If a party "was asked specific questions about, yet denied knowledge of, the material aspects of her case, the material allegations in her affidavit directly contradict her deposition." *Powell-Pickett v. A.K. Steel Corp.*, 549 F. App'x 347, 353 (6th Cir. 2013).

The Court will strike paragraphs 9 and 18 of Plaintiff's affidavit. (ECF No. 20-3, PageID.1077, 1079.) In paragraph 9, Plaintiff asserts,

> In September 2020 I complained to Plant Manager Serra how the company continued to illegally deduct arrearages from our paychecks for payments of benefits for the period the plant was shut due to COVID through May 18, 2020, in contravention to State policy barring these charges. PM Serra threatened to fire me if I exposed this illegal activity by FNG management.

(*Id.* at PageID.1077.)

> Paragraph 18 states,

> Shortly after making that inquiry, in late October, Janella, the supervisor, held a meeting on the floor stating employees need to sign a sheet. I read the sheet, which indicated the employees had been trained on COVID-19 protocol on how to clean and disinfect

their machines and had the materials to perform the job. At the meeting I informed her that I refused to sign as no one had been trained, and there was not any disinfectant or towels at my workstation.

(*Id*. at PageID.1079.) Plaintiff does not mention these incidents in her deposition testimony. (*See* ECF No. 20-2.) Further, Plaintiff testified that her deposition testimony contained all of her objections related to "how the company handled COVID protocol." (*Id*. at PageID.1049.)[3] Plaintiff does not provide any justification for her directly contradictory testimony. Paragraphs 9 and 18 directly contradict Plaintiff's prior sworn testimony and will be stricken from the record.

The Court will also strike paragraph 28 of her affidavit, which states,

---

[3] The testimony is as follows:

Q. . . . Do you have any objection to how the company handled COVID protocol other than what we've already discussed? . . .
A. No, other than not giving any protection to us . . . . Meaning that we should come to work and feel safe. And you feel safe if your employer is honest . . . It's in the plant. We gonna let you guys know that it's in the plant.
Q. Okay. What protections are you talking about?
A. Let's start off with not having hot water in the ladies restroom. Let's start off by not having the proper disinfect. Let's start off with people urinating all over the floor and flies and things like that.
Q. Anything else?
A. No, that's it, ma'am.

(ECF No. 20-2, PageID.1049.)

> Throughout 2021 Jamilla Long, along with Astrik and other management deliberately refused to have parts delivered to my station on a regular basis, until I was finally able to reach another supervisor and a Hi-Lo driver. My parts bins were empty except for one with six defective parts, yet my production was supposed to be 200-220 parts per day which I could not make because of the lack of parts, creating daily stress on the job.

(ECF No. 20-3, PageID.1080–1081.)

Defendant argues that this portion of the affidavit should not be considered because Plaintiff had previously testified that a "'foreign' team lead" was "the only person who allegedly refused to supply her with parts." (ECF No. 23, PageID.1321.) The Court agrees. In Plaintiff's deposition she testifies that she does not "know of anyone else other than him" who "didn't provide [her] with the parts [she] needed." (ECF No. 20-2, PageID.1066.)[4]  Plaintiff does not provide justification for her directly

---

[4] The testimony is as follows:

Q. Okay. And I believe you mentioned that that – you said the foreign employee did that because he intentionally did not put parts there; is that right?
A. Yes.
Q. Okay. Is there anyone else who didn't provide you with the parts you needed other than him?
A. I couldn't speak about anyone else, but he's the team lead, so he's the one that calls everyone.
Q. So you don't know of anyone else other than him today?
A. No.

(ECF No. 20-2, PageID.1066.)

14

contradictory testimony. The Court therefore strikes paragraph 28 of the affidavit.

Finally, the Court declines to strike paragraph 22 of the affidavit. Defendant claims that Plaintiff's testimony that she was "moved from my regular machine and placed on another machine in another department that I was not familiar with and was not trained on as punishment" due to her COVID-19-related complaints (ECF No. 20-3, PageID.1079–1080), is directly contradicted by her deposition testimony. (ECF No. 23, PageID.1321–1322.) In her deposition, Plaintiff describes a time when she was placed on a "mixup" machine without training, and states that it occurred before COVID-19. (ECF No. 20-2, PageID.1042.) This is not a direct contradiction. Plaintiff's deposition testimony indicates that this happened to her for "several jobs" (*id.*), suggesting that she was placed on a machine without training several times other than the one instance described. Additionally, there is no indication that this statement in the affidavit constitutes an attempt to create a sham fact issue. As such, paragraph 22 of the affidavit will not be stricken.

## B. The COVID-19 Employment Rights Act

CERA passed on October 22, 2020, and was effective retroactive to March 1, 2020. 2020 Mich. Legis. Serv. P.A. 238 (H.B. 6032). It was amended twice, on December 28, 2020 and July 11, 2022, and repealed on July 1, 2023. 2020 Mich. Legis. Serv. P.A. 339 (S.B. 1258); 2022 Mich. Legis. Serv. P.A. 138 (H.B. 5244). Plaintiff appears to allege violations of CERA between May 18, 2020 and November 2021. At oral argument, Plaintiff represented that the Court should only refer to the October 22, 2020 version of CERA, and Defendant did not object. As such, the Court will exclusively refer to the October 22, 2020 version of CERA.

Plaintiff brings suit pursuant to Mich. Comp. Laws § 419.403, which states:

> [A]n employer shall not discharge, discipline, or otherwise retaliate against an employee who does any of the following:
>
> (a) Complies with [§ 419.405] including where an employee who displays the principal symptoms of COVID-19 does not report to work and later tests negative for COVID-19.
>
> (b) Opposes a violation of this act.
>
> (c) Reports health violations related to COVID-19.

Plaintiff must demonstrate that she was discharged, disciplined, or otherwise retaliated against due to (a) her compliance with the

16

quarantine requirements in Mich. Comp. Laws § 419.405; (b) her opposition to a violation of CERA; and/or (c) her reporting a health violation related to COVID-19.[5]

At oral argument, the parties agreed that the Court should determine whether Defendant retaliated against Plaintiff by utilizing the burden-shifting analysis in Title VII and Elliot-Larsen Civil Rights Act ("ELCRA") suits. In order to establish a prima facie case of retaliation, Plaintiff must demonstrate "(1) that [she] engaged in a protected activity, (2) that this was known by the defendant, (3) that the defendant took an employment action adverse to the plaintiff, and (4) that there was a causal connection between the protected activity and the adverse employment action." *Meyer v. City of Center Line*, 242 Mich. App. 560, 568–69 (2000). If Plaintiff is able to establish a prima facie case, "the burden shifts to the defendant to articulate a legitimate business reason for the [adverse employment action]." *Taylor v. Modern Engineering, Inc.*, 252 Mich. App. 655, 659 (2002). "If the defendant produces evidence

---

[5] Plaintiff brings two counts under CERA: "Count I-Violation of MCL 419.401 et seq." and "Count III-Retaliation in violation of MCL 419.401 et seq. . . . ." (ECF No. 6-1, PageID.226–230.) Because CERA requires an act of retaliation, the Court will analyze the counts as one.

establishing the existence of a legitimate reason for the [adverse employment action], the plaintiff then has the opportunity to prove that the legitimate reason offered by the defendant was not the true reason, but was only [] pretext . . . ." *Id.*

### C. Violations of § 419.403(1)(a)

Pursuant to § 419.403(1)(a), an employer may not discharge, discipline, or otherwise retaliate against an employee who complies with the quarantine requirements in Mich. Comp. Laws § 419.405. Section 419.403(1)(a) clarifies that those protections include employees who display "principal symptoms" of COVID-19 and do not report to work, but later test negative for COVID-19.

Even in the light most favorable to Plaintiff, she has not demonstrated a violation of § 419.403(1)(a) because she does not establish an instance where the quarantine requirements were applicable to her or where she was not permitted to follow the quarantine requirements in § 419.405.

Section 419.405(1) states that an employee who tests positive for COVID-19 or "displays the principal symptoms of COVID-19" should not report to work until <u>all</u> of the following conditions are met. First, if the

employee had a fever, they must be fever-free for at least 24 hours. Mich. Comp. Laws § 419.405(1)(a). Second, ten days must have passed since the later of (a) the date the employee's symptoms first appeared, or (b) the date the employee received a positive COVID-19 test. *Id.* § 419.405(1)(b). Third, the employee's principal symptoms of COVID-19 must have improved. *Id.* § 419.405(1)(c).

"Principal symptom of COVID-19" is defined two ways: if one of the following symptoms is present: fever, shortness of breath, uncontrolled cough; or if two or more of the following symptoms are present: abdominal pain, diarrhea, loss of taste or smell, muscle aches, severe headache, sore throat, vomiting. *Id.* § 419.401(h).[6]

### i. *Allegations regarding May 2020*

To the extent Plaintiff claims that her allegations regarding events in May 2020 constituted a violation of CERA, Plaintiff fails to allege that she experienced a "principal symptom" of COVID-19.

---

[6] "Principal symptom of COVID-19" can also be defined by "order of the director or chief medical executive of [MDHHS]." § 419.401(h). Plaintiff does not provide any orders that define "principal symptom"; as such, the Court will only refer to "principal symptoms" as defined in CERA.

As alleged by Plaintiff, she returned to work on May 18, 2020, after being laid off. (ECF No. 20, PageID.995.) Although Plaintiff experienced "sinus issues" and/or a runny nose, she tested negative for COVID-19 and was instructed to return to work.

Even viewing the facts in the light most favorable to Plaintiff, she does not allege she experienced any of the "principal symptoms of COVID-19" as defined by § 419.401(h). A runny nose or sinus issues are not listed as principal symptoms. As such, Plaintiff has not demonstrated a violation of CERA related to her May 18, 2020 illness.

### ii.    Allegations regarding October 2020

Similarly, to the extent Plaintiff claims that her allegations regarding her COVID-19 exposure in October 2020 constituted a violation of CERA, the Court disagrees because Plaintiff does not allege that she experienced a "principal symptom" of COVID-19. (*See* ECF No. 20, PageID.1015 (arguing Plaintiff "was denied a quarantine and ordered back to work when she returned to work after a COVID exposure and was still experiencing symptomatic diarrhea").)

Between October 11–21, 2020, Plaintiff had diarrhea. (ECF No. 20-3, PageID.1077.) On October 21, 2020, an MDHHS representative

informed her that she was exposed to COVID-19 at work on October 7, 2020, two weeks prior. (ECF No. 20-2, PageID.1045; ECF No. 20-14, PageID.1146–1147.) The representative told Plaintiff that diarrhea can be a symptom of COVID-19, and emailed her a letter. (ECF No. 20-3, PageID.1077–1078; ECF No. 20-14.)

On October 22, 2020, Plaintiff showed the letter to a supervisor and was permitted to test for COVID-19 by HR. (ECF No. 20-3, PageID.1078; ECF No. 20-2, PageID.1045–1046.) She tested negative. (*Id.* at PageID.1045.) Defendant instructed Plaintiff that she could not continue quarantining and had to return to work. (*Id.*) Plaintiff argues that Defendant's refusal to permit her to quarantine, in light of her diarrhea and her exposure to COVID-19, violated CERA. (ECF No. 20, PageID.999.)

Again, viewing the facts in the light most favorable to Plaintiff, Plaintiff does not demonstrate that Defendant violated CERA. Section 419.405(1) provides requirements for employees who test positive or display a principal symptom of COVID-19. However, Plaintiff tested negative and did not display a principal symptom. Diarrhea, on its own, is not a principal symptom. § 419.401(h)(ii).

Additionally, § 419.405(2) states that employees who "ha[d] close contact" with someone who tested positive for COVID-19 should not report to work until 14 days have passed or until there is a medical determination that the person did not have COVID-19 at the time of exposure. Here, 14 days had passed by the time Plaintiff received notice of her exposure.

As such, Plaintiff has not demonstrated a violation of CERA related to her October 2020 exposure.

### D. Violations of §§ 419.403(1)(b)–(c)

Under § 419.403(1)(b), an employer cannot discipline, discharge, or otherwise retaliate against an employee who "[o]pposes a violation of this act." "[T]his act" undoubtedly refers to CERA. Additionally, pursuant to § 419.403(1)(c), an employer cannot discharge, discipline, or otherwise retaliate against an employee who "[r]eports health violations related to COVID-19."

The Court will grant summary judgment on Plaintiff's claims pursuant to §§ 419.403(1)(b) and (c) because Plaintiff fails to establish a prima facie case. In order to establish a prima facie case under CERA, Plaintiff must demonstrate "(1) that [she] engaged in a protected activity,

(2) that this was known by the defendant, (3) that the defendant took an employment action adverse to the plaintiff, and (4) that there was a causal connection between the protected activity and the adverse employment action." *Meyer*, 242 Mich. App. at 568–69.

Plaintiff alleges a variety of "protected activity." She states she "opposed and reported numerous employer violations of its duties to protect the safety of its employees during the COVID epidemic" (ECF No. 20, PageID.1014), and "continually complained of unsanitary conditions" in the workplace. (*Id.* at 1016.) With regard to adverse employment actions, Plaintiff states that these acts of retaliation include her constructive discharge, her written warning for grandstanding, being "repeatedly moved to new and unfamiliar work assignments," being "scrutinized on a daily basis by her supervisor," and "not [being] properly supplied with parts or given defective parts."[7] (*Id.* at PageID.1017–1018.)

> i.   *Constructive Discharge*

In her response to the motion for summary judgment, Plaintiff states, for the first time, that one of the retaliatory acts she experienced

---

[7] Plaintiff does not argue in her response brief that she experienced a hostile work environment. As such, the Court will not conduct a hostile work environment analysis regarding her retaliation claim.

was "constructive discharge." (ECF No. 20, PageID.1018.) Even if Plaintiff had alleged constructive discharge in her amended complaint, Plaintiff was not constructively discharged because she was terminated.

"To demonstrate a constructive discharge, the plaintiff must show that (1) the employer deliberately created intolerable working conditions, as perceived by a reasonable person; (2) the employer did so with the intention of forcing the employee to quit; and (3) the employee actually quit." *Hurtt v. International Services, Inc.*, 627 Fed. App'x 414, 420 (6th Cir. 2015) (citation omitted). It is undisputed that Plaintiff was terminated, and did not quit. (ECF No. 17-17; *see* ECF No. 20, PageID.1010 ("Plaintiff did not abandon her job. She continued to log in to Defendant's leave coordinator Morningstar every day after the incident until she was terminated."); *see also* ECF No. 17-5, PageID.666; ECF No. 20-2, PageID.1032.)

As such, any claim related to "constructive discharge" is dismissed.

### ii.   *Verbal Warning for Grandstanding*

On November 3, 2020, Plaintiff was issued a verbal warning for grandstanding. (ECF No. 20-17; ECF No. 20, PageID.1017.) She claims she was issued a verbal warning "for asking about COVID-19 safety

24

protocols and asking why proper safety materials were not in place such as disinfectant and towels, as well as informing employees of their rights to be informed of COVID in the plant and to be tested and quarantined if suffering symptoms from potential exposure pursuant [to] COVID protocols." (*Id.* at PageID.1001–1002.) Plaintiff also states that she was issued this verbal warning because she "raised the issues of employees not being informed of COVID in the plant and to properly quarantine in a letter to Defendant [sic] counsel in November 2020."[8] (*Id.* at PageID.1015.)

Plaintiff asserts that her verbal warning for "grandstanding" was an adverse employment action because it meets the standard articulated in *Burlington Northern & Santa Fe Ry. v. White*, 548 U.S. 53 (2006).[9]

---

[8] The record does not support a claim that the verbal warning for grandstanding was issued because of the "letter to Defendant counsel in November 2020." (ECF No. 20, PageID.1015.) The verbal warning was issued on or before November 3, 2020 (ECF No. 20-17), and the letter is dated November 4, 2020. (*See* ECF No. 6-1, PageID.285–286.) In fact, the letter references the grandstanding verbal warning, which indicates that the letter could not have caused the verbal warning.

[9] Defendant opposes this standard because it is "inconsistent with the case law interpreting CERA and the model jury instructions cited by [Defendant]." (ECF No. 23, PageID.1316 n.1.) However, Defendant does not provide any relevant cases, and the Court is unable to find cases interpreting CERA that opposes this standard. Additionally, the model jury instructions presented by Defendant, which come from the 2021 edition of Michigan Nonstandard Jury Instructions, Civil, are not

(ECF No. 20, PageID.1017.) *Burlington Northern* states, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Burlington Northern*, 548 U.S. at 68 (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)).

Under Title VII, adverse employment actions involve "a loss of pay or benefits, a detrimental change in responsibilities, a negative change in the terms or conditions of employment, or some other actual and unfavorable change in job status." *Milczak v. Gen. Motors, LLC*, 102 F.4th 772, 786 (6th Cir. 2024). The Supreme Court explained that an adverse employment action need not be "serious," "significant," or "substantial"; instead, the plaintiff "must show some harm respecting an identifiable term or condition of employment." *Muldrow v. City of St. Louis*, 601 U.S. 346, 354–55 (2024). "In short, the employment action is adverse if it leaves the employee 'worse off respecting employment terms or

---

incompatible with *Burlington Northern*. The model jury instructions do not describe which employer acts are retaliatory and which are not. Hon. William B. Murphy & John Vandenhombergh, *Michigan Nonstandard Jury Instr. Civil* §§ 39:63, 39:64, 39:66, 39:67 (2021 Ed.).

conditions.'" *McNeal v. City of Blue Ash*, 117 F.4th 887, 900 (6th Cir. 2024) (quoting *id*. at 355).

Plaintiff does not explain why a verbal warning in this context "produces a 'disadvantageous' change in an 'identifiable term or condition'" of employment. *McNeal*, 117 F.4th at 901 (quoting *Muldrow*, 601 U.S. at 347). She claims the verbal warning was a "message" (ECF No. 20, PageID.1017), but does not explain how this message affected her employment. The verbal warning, on its own, is not sufficient to demonstrate an adverse employment action. *See McNeal*, 117 F.4th at 903 (describing disciplinary actions that "likely do not meet the definition of an 'adverse employment action,' including 'documented counseling,' an 'oral reprimand,' and a 'written reprimand'" (internal citations omitted)).

Therefore, Plaintiff's claims related to her verbal warning are dismissed.

### iii.   *Plaintiff does not sufficiently demonstrate causation for the remainder of her claims*

The remaining acts of retaliation alleged by Plaintiff are her being "repeatedly moved to new and unfamiliar work assignments," being "scrutinized on a daily basis by her supervisor," and "not [being] properly supplied with parts or given defective parts." (ECF No. 20, PageID.1017–

27

1018.) The Court will not consider allegations related to not being supplied parts because that portion of Plaintiff's post-deposition affidavit are stricken and there is no other evidence in the record supporting this allegation. *See supra* III.A; (*see also* ECF No. 20, PageID.1006.)[10] Plaintiff's claims related to these remaining adverse employment actions are not sufficient to establish a prima facie case.

As discussed during oral argument, the Court is unable to discern much of Plaintiff's claims regarding alleged violations of §§ 419.403(1)(b)–(c) because they are unorganized and lack specificity. Generally speaking, Plaintiff's claims under §§ 419.403(1)(b)–(c) are deficient because her response brief fails to connect any particular protected activity with any particular adverse employment action, and, as such, the Court cannot establish causation as required to set forth a

---

[10] For the contention that she was not supplied parts, Plaintiff cites a stricken paragraph of her post-deposition affidavit (ECF No. 20-3), her deposition (ECF No. 20-2, PageID.1072), and photos of her workstation and parts bins taken at unidentified times. (ECF No. 20-26.) None of these exhibits support an allegation that "[t]hroughout 2021 Jamilla Long, along with Astrik and other management, deliberately refused to have parts delivered to Plaintiff's workstation on a regular basis." (ECF No. 20, PageID.1006.)

prima facie case.[11] Plaintiff's duty to establish causation is especially crucial because Plaintiff alleges facts that occurred over a period of about one and a half years[12] and involved numerous supervisors.[13] The Court is unable to determine that Plaintiff has properly alleged causation because it cannot discern which supervisors knew about which protected acts. *See Reed v. Procter & Gamble Mfg. Co.*, 556 F. App'x 421, 431 (6th Cir. 2014) (describing Plaintiff's burden to "show that the relevant decisionmakers were aware of [her] protected activity"); *see also id.* ("While a plaintiff can point to circumstantial evidence of such knowledge, he or she must produce 'specific facts'. . . ." (quoting *Mulhall v. Ashcroft*, 287 F.3d 543, 552–53 (6th Cir. 2002))).

---

[11] Further, it is Plaintiff's duty to sufficiently present this information to the Court. The Court is not "obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989).

[12] Plaintiff returned to work during the COVID-19 pandemic in May 2020 (ECF No. 20, PageID.995), reported to work for the last time on November 22, 2021 (*Id.* at PageID.1007–1008, 1010), and was terminated on January 18, 2022. (ECF No. 20-2, PageID.1032.)

[13] The plethora of supervisors involved appear to include, at a minimum, "HR representatives," "supervisor Keith," "Plant Manager Serra" (otherwise referred to as "Superintendent Sam") "Astik"/"Astrik"/"Astrid," "Janella," "Cary Jo," "Team Lead Que," "Jeff Tabaka (HR)," "Jenella Walker," "Timothy Graham," "Jamilla Long," "supervisor Wiley," "HR Cupal," and "supervisor Mike Osha." (ECF No. 20, PageID.995, 997–1009.)

Additionally, the Court is unable to find causation for many of the described acts because Plaintiff does not allege when specific protected acts or adverse employment actions occurred such that causation could be possible. *See id.* (finding that the plaintiff did not establish a causal connection also because "the record provides no details as to . . . when [the complaints] were made").

Transfer to unfamiliar work and being scrutinized

Plaintiff does not establish a prima facie case related to being "moved to new and unfamiliar work assignments" and being "scrutinized on a daily basis" by a supervisor. (ECF No. 20, PageID.1018.)

Plaintiff presents evidence that she was transferred at least twice to a less desirable or more difficult work situation. In her July 9, 2020 NLRB charge, she states, "I have been put on machines I wasn't trained for" and "given harder jobs." (ECF No. 20-12, PageID.1138; *see also* ECF No. 20, PageID.997.) Plaintiff's post-deposition affidavit also suggests that some time after she was given a verbal warning for grandstanding,[14]

---

[14] Because the preceding paragraph describes Plaintiff's grandstanding verbal warning, the Court will construe this transfer as occurring after November 3, 2020. (See ECF No. 20-3, PageID.1079.) The Court notes that this assumption is generous. Plaintiff's affidavit does not describe events in chronological order. (*See*, *e.g.*, ECF No. 20-3, PageID.1080 (describing acts that occurred "[t]hroughout 2021"); *id.* at

she was "moved from [her] regular machine and placed on another machine in another department that I was not familiar with and was not trained on as punishment." (ECF No. 20-3, PageID.1079–1080 (stating she "continued to be targeted"); *see also* ECF No. 20, PageID.1004.) After this transfer, Plaintiff was "scrutinized on a daily basis by her supervisor" at her new work assignment. (*Id.* at PageID.1018.)[15]

As described previously, Plaintiff testified in her deposition that she was moved to a machine she was not familiar with for "several jobs." *See supra* III.A; (ECF No. 20-2, PageID.1042.) One of these machines was a "mixup" machine. (*Id.*) Plaintiff does not describe any other job she was not trained for.

---

PageID.1081 (describing a letter that appears to be sent on November 4, 2020, and then stating that she filed her NLRB charge on July 9, 2020).) Indeed, it is difficult to tell when any particular fact occurred when Plaintiff does not explicitly reference a date or specific event.

[15] Plaintiff also cites a series of emails she sent to Defendant's management on April 30, 2021 and May 7, 2021, in which she describes "being moved from job to job by supervisor Wiley in such a manner that it was obvious to her co-workers that she was being harassed" on April 28, 2021. (ECF No. 20, PageID.1006 (citing ECF No. 20-27).) The Court has carefully reviewed that email and Plaintiff's brief, and concludes that this incident does not demonstrate retaliation for a number of reasons, including that there is no demonstration of causation between Wiley's actions and any particular protected act by Plaintiff, or that Wiley was aware of Plaintiff's protected conduct.

31

To the extent Plaintiff claims her transfer to the "mixup" machine was the result of retaliation due to her complaints about COVID-19, that claim is denied because she was transferred prior to the COVID-19 pandemic and, as such, that transfer cannot be related to her CERA claims. (*Id.*)

Regarding the transfer described in her July 2020 NLRB charge (ECF No. 20-12), Plaintiff has not set forth a prima facie case of retaliation because she has not demonstrated a causal connection between any specific, protected act and a specific act (or acts) of retaliation. Based on the record before the Court, there is no evidence regarding who made the decision to put Plaintiff on a different machine prior to July 2020, when it occurred, or any other indication that she was placed on that machine because of her protected activity. *See*, e.*g.*, *Browning v. Franklin Precision Indus., Inc.*, No. 121CV00071GNSHBB, 2023 WL 2730267, at *7 (W.D. Ky. Mar. 30, 2023) (holding that the plaintiff failed to make out a prima facie case of retaliation because he "has pointed to no evidence in the record identifying the decisionmakers and their knowledge of [his protected acts]"), *aff'd*, No. 23-5406, 2023 WL 8437235 (6th Cir. Dec. 5, 2023).

Additionally, Plaintiff's claim of retaliation based on the reassignment described in her post-deposition affidavit is denied because, based on the record presented, a jury could not reasonably find that this was a retaliatory action. The affidavit sets forth the following facts regarding this allegation:

> I continued to be targeted by management for informing my co-workers of their rights to demand management act in conformity with Covid protection protocols under the law. I was moved from my regular machine and placed on another machine in another department that I was not familiar with and was not trained on as punishment. My supervisor Janella would keep coming to the area where I was placed and watch me despite it being the area of another supervisor named Wally.
>
> [] My supervisor Janella came into the area so much other employees began asking why Janella kept coming to the area watching me. I tried speaking with the safety officer Cary Jo, who indicated my discipline and current treatment was coming from Human Resources manager Jeff and Superintendent Sam and she had no control of the situation.

(ECF No. 20-3, PageID.1079–1080.) Even if the Court construes Plaintiff's reassignment and supervision as occurring after her grandstanding verbal warning, she has not demonstrated causation.[16]

---

[16] The Court also notes that increased supervision, in this context, does not appear to be an adverse employment action because Plaintiff does not demonstrate that it was a "harm respecting an identifiable term or condition of employment." *Muldrow*, 601 U.S. at 354–55.

33

Causation can be demonstrated through "evidence that defendant treated the plaintiff differently from similarly situated employees or that the adverse action was taken shortly after the plaintiff's exercise of protected rights." *George v. Youngstown State Univ.*, 966 F.3d 446, 460 (6th Cir. 2020) (quoting *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000)).

Plaintiff does not demonstrate temporal proximity. She does not identify when this transfer took place,[17] and the Court, though required to view the evidence in the light most favorable to Plaintiff, she has failed to show that temporal proximity occurred. Similarly, Plaintiff does not provide other evidence of causation (such as that other employees were not transferred to a machine they were not familiar with), and does not demonstrate that this specific work assignment was related to a particular protected act.

<u>Supplying Plaintiff with defective parts</u>

Plaintiff also alleges that she was retaliated against because she was "given defective parts which affected her ability to perform her job

---

[17] As described in the affidavit, Plaintiff's transfer to another machine could have occurred anytime between November 3, 2020 (the date she was issued a verbal warning) to November 22, 2021 (the last day she went to her workplace).

in a safe and effective manner." (ECF No. 20, PageID.1018; *see also id.* at PageID.1006 ("Plaintiff was delivered defective parts to use on her jobs which supervisors pushed her to use.").) Plaintiff's claim of retaliation based on defective parts fails. Even assuming that these acts could be construed as an adverse employment action, Plaintiff has not demonstrated causation between the deficient parts and a particular protected act.

"To establish the causal connection required in the fourth prong [of a prima facie case of retaliation], a plaintiff must produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken had the plaintiff not [engaged in the protected activity]." *Nguyen*, 229 F.3d at 563. Plaintiff has not provided sufficient evidence for this inference. Plaintiff testified that other employees received defective parts, which indicates that Plaintiff's treatment was similar to other employees who did not bring COVID-19-related complaints. (ECF No. 20-2, PageID.1065 ("Q. So are you saying that you're the only person who was provided with these [damaged parts]? A. . . . [T]hey put these parts on the lines where there are Black people

35

working . . . . Q. And so you're saying this was only placed at the work stations of Black employees? A. Absolutely.").)

Plaintiff also does not identify who delivered defective parts to her or who pushed her to use defective parts, and whether those individuals knew of her protected actions under CERA and then retaliated against her due to those actions. (*See* ECF No. 20, PageID.1006 ("Plaintiff was delivered defective parts to use on her jobs which supervisors pushed her to use."); ECF No. 20-2, PageID.1065 (identifying the person delivering defective parts as "the guy with that blue hoodie on").)

Without this information, Plaintiff has failed to establish a prima facie case regarding this claim.

### iv.   *Claim related to threat to terminate Plaintiff*

Plaintiff alleges she "had a meeting with HR manager Tabaka" and "informed him that he had an obligation to inform us of COVID-19 being in the plant," and that "Plant Manager Sam threatened to fire her for raising these issues in the Plant." (ECF No. 20, PageID.1001.) As an initial matter, Plaintiff does not raise this alleged threat as an adverse employment action. (*Id.* at PageID.1016–1018.) However, even if Plaintiff had affirmatively raised Sam Serra's threat to terminate her

employment as an adverse employment action, the Court would grant summary judgment for that claim because Plaintiff does not establish a related protected act.

Here, Plaintiff testified in her deposition that "Sam threatened to fire [her] in October" of 2020 "when [she] asked him the question." (ECF No. 20-2, PageID.1045.) The Court cannot discern what "the question" was. The other exhibit cited by Plaintiff does not mention Sam Serra at all. (ECF No. 20, PageID.1001 (citing ECF No. 20-20).) In her post-deposition affidavit, Plaintiff states that Sam Serra told her "that if I said the word COVID again in the plant I would be terminated." (ECF No. 20-3, PageID.1079.)

Section 419.403(1)(b) prohibits retaliation against an employee who "[o]pposes a violation of [CERA]," and § 419.403(1)(c) prohibits retaliation against an employee who "[r]eports health violations related to COVID." Plaintiff makes no attempt to demonstrate that this incident violates CERA, or involves a report of a health violation related to COVID-19, and the factual record does not indicate that either of those protected acts

37

took place.[18] For these reasons, Defendant's motion for summary judgment with respect to Plaintiff's claim related to the alleged threat to terminate her employment is granted.

## IV. Conclusion

For the reasons set forth above, Defendant's motion for summary judgment (ECF No. 17) is GRANTED.

IT IS SO ORDERED.

Dated: June 9, 2025          s/Judith E. Levy
       Ann Arbor, Michigan    JUDITH E. LEVY
                              United States District Judge

---

[18] Defendant argues that CERA only applies to "actual" health violations related to COVID-19, and that Plaintiff's claim fails because she only made generalized complaints that did not involve "actual" violations. (ECF No. 17, PageID.427.) Defendant states that CERA's legislative history supports this interpretation, but does not provide any legislative history. The Court is unable to locate any legislative history that supports Defendant's interpretation, and such a requirement is not in CERA's plain text. Further, it would make little sense to structure an anti-retaliation statute to only protect employees who report "actual" violations, as allowing retaliation against employees with a reasonable belief that a violation occurred would have a chilling effect. Other anti-retaliation statutes, such as ELCRA, Title VII, and the False Claims Act, only require a reasonable belief that a violation occurred. *See Bromley v. Parisian, Inc.*, 55 F. App'x 232, 237 (6th Cir. 2002) ("[T]o be protected by ELCRA, Bromley need not be opposing an actual violation, but rather, her belief that the opposed practices are unlawful must only be reasonable."); *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 579 (6th Cir. 2000) ("Under Title VII, an employee is protected against employer retaliation for opposing any practice that the employee reasonably believes to be a violation of Title VII."). Regardless, Plaintiff's claims are meritless for other reasons unrelated to whether her belief that CERA violations occurred are reasonable.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or first-class U.S. mail addresses disclosed on the Notice of Electronic Filing on June 9, 2025.

s/William Barkholz
WILLIAM BARKHOLZ
Case Manager

39